1

**KAUFMAN DOLOWICH & VOLUCK, LLP**
AIMEE G. HAMOY (SBN 221228)

2

ROGELIO SERRANO (SBN 312004)
180 Grand Ave, Suite 995

3

Oakland, CA  94612
Telephone: (415) 926-7600

4

Facsimile: (415) 926-7601
E-mail: ahamoy@kdvlaw.com;

5

rserrano@kdvlaw.com

6

Attorneys for Defendants
CITY OF SAUSALITO, SAUSALITO POLICE

7

DEPARTMENT, CHIEF JOHN ROHRBACHER,
DETECTIVE DAVIN ROSE, POLICE

8

OFFICERS' THOMAS GEORGES, SEAN
SMAGALSKI, NICK WHITE

9

CHARLES A. BONNER, ESQ.  SB# 85413

10

A. CABRAL BONNER, ESQ. SB# 247528
LAW OFFICES OF BONNER & BONNER

11

475 GATE FIVE RD, SUITE 211
SAUSALITO, CA 94965

12

TEL: (415) 331-3070
FAX: (415) 331-2738

13

cbonner799@aol.com
cabral@bonnerlaw.com

14

Attorneys for plaintiffs

15

JEREMY PORTJE AND AMY PORTJE

16

### UNITED STATES DISTRICT COURT

17

### NORTHERN DISTRICT OF CALIFORNIA

18

### SAN FRANCISCO DIVISION

19

JEREMY PORTJE AND AMY PORTJE

Case No.:  3:22-cv-01029CRB

20

Plaintiffs,

21

v.

**JOINT INITIAL CASE
MANAGEMENT CONFERENCE
STATEMENT** : ORDER

22

CITY OF SAUSALITO, SAUSALITO POLICE
DEPARTMENT, CHIEF JOHN

23

ROHRBACHER, DETECTIVE DAVIN ROSE,
POLICE OFFICERS' THOMAS GEORGES,

**DATE: October 21, 2022
TIME: 8:30 A.M.**

24

SEAN SMAGALSKI, NICK WHITE, AND
DOES 1-10, INCLUSIVE,

**Courtroom: 6 – 17th Fl.
                San Francisco**

25

Defendants.

26

27

28

1

1
2
3
4

The parties hereby submit this Joint Case Management Conference Statement. Plaintiffs Jeremy Portje and Amy Portje are represented by Charles Bonner and A. Cabral Bonner of The Law Offices of Bonner & Bonner. Defendants City of Sausalito, et al, are represented by Aimee Hamoy and Rogelio Serrano of Kaufman Dolowich & Voluck.

5
6
7
8
9

1. **<u>Jurisdiction and Service</u>**: All parties have been served in this matter. Plaintiffs' allegations include First Amendment, Fourth Amendment, and Fourteenth Amendment claims, as well as corresponding state law claims of discrimination, negligence and seek monetary damages. Therefore, venue is proper in the Northern District of California.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

2. **<u>Defendants' Statement of Facts</u>**: Sausalito police officers Sean Smagalski, Nick White, and Thomas Georges responded to a call regarding an assault and battery at the Marinship homeless encampment in Sausalito on November 30, 2021. Plaintiff Jeremy Portje, allegedly acting as a photo journalist, was filming activities in the encampment area using a video camera on a tripod while the officers were investigating the assault and battery that had been reported. After some time in the area, Plaintiff Jeremy Portje was arrested by Sgt. Thomas Georges with the assistance of Officer Nick White and Sean Smagalski for striking Sgt. Georges with his video camera. Plaintiff Jeremy Portje's personal property was seized as part of the arrest. Plaintiff claimed his shoulder was injured during the arrest and was taken to a local hospital for emergency treatment. Plaintiff was released that evening and was held in custody until the following early morning. Plaintiff claims he was wrongfully arrested and that his personal property was wrongfully searched, despite the issuance of a search warrant to do so. Plaintiff's property was returned to him after charges were not filed. Plaintiff's wife, Amy Portje, claims loss of consortium/emotional distress as a result of Plaintiff Jeremy Portje's arrest and detention.

Defendants City of Sausalito, et al. dispute Plaintiff Jeremy Portje's claim that he was arrested improperly. Defendants further contend the search warrant was properly issued and no violation of the United States Constitution or any state law occurred.

///

28

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

1

**Plaintiffs' State of Facts:**

2

On or about, November 30, 2021, MR. PORTJE, a Marin county journalist who had

3

been covering Marin county and the State of California for twenty five years and who has

4

consistently published with such outlets as the Marin Independent Journal, Santa Rose Press

5

Democrat, the Associated Press, and the Mercury News, received a phone call from Timothy

6

Logan, an anchor-out boat owner living at the homeless encampment at Marinship Park

7

whose boat was facing imminent destruction by the CITY. As part of an ongoing

8

documentary film project that was telling the stories of three Marin County residents

9

experiencing homelessness in the County, MR. PORTJE was capturing documentary footage

10

of Mr. Logan's navigation into homelessness in Sausalito on account of the CITY's eviction

of anchor out boat owners in Richardson Bay.

11

MR. PORTJE gathered up his video recording gear consisting of his Canon C300

12

Mark 2 video camera, zoom lenses, tripod, extended batteries, SD storage cards, wireless

13

receiver, and lavalier microphones and proceeded to meet Mr. Logan at Sausalito's Army

14

Corp Debris Yard, the site of Sausalito's campaign of crushing and destroying the confiscated

15

anchor-out boats. Such footage was integral in telling Timothy Logan's story of the CITY's

16

complicity in rendering him homeless.

17

Ever since the anchor-out community was rendered homeless on account of the

18

CITY's uncompromising policy of eviction and confiscation of the anchor-out community's

19

boats and vessels, the community has been staging demonstrations and engaging in advocacy

20

for their cause from their temporary encampment at Marinship Park. In covering this issue,

21

both for his documentary as well as for various news outlets in Marin County, MR. PORTJE

22

has reported from Marinship Park on many occasions.

23

At approximately 4:30 p.m., Timothy Logan and MR. PORTJE, with camera at hand,

24

arrived at Sausalito's Army Corp Debris Yard and upon Mr. Logan's request to access the

25

yard and attempt to legally forestall the destruction of his boat, the Debris Yard's officials

26

barred both MR. PORTJE and Mr. Logan's entry.

27

Thereafter, in walking over to Marinship Park which is in close proximity to the

28

Debris Yard and hearing screaming and yelling, MR. PORTJE and Mr. Logan observed

1   ongoing police activity at the park. As part of his journalistic coverage of the unfolding events
2   with the anchor-out homeless community and its resulting adverse relationship with the CITY
3   and the SPD, MR. PORTJE assembled his camera and tripod in order to record the police's
4   activity and unfolding events.

5           Throughout his twenty-five years of journalistic reporting at the site of law
6   enforcement activities, MR. PORTJE held a firm understanding as a journalist of where to
7   position himself to both respect law enforcements' required perimeter and provide for his own
8   safety. As police presence at the park involved an encampment member whose story MR.
9   PORTJE had been previously following, MR. PORTJE directed his camera at law
10  enforcement while they were engaging with that member. MR. PORTJE moved throughout
11  the area capturing footage from different locations and angles while safely and respectfully
12  keeping his distance from law enforcement's activities. Without any reason to admonish or
13  redirect MR. PORTJE's position or location, DEFENDANT OFFICERS made no contact
14  with MR. PORTJE. This was especially the case given that DEFENDANT OFFICERS were
15  well familiar with MR. PORTJE's journalistic presence as they had observed him on more
16  than several occasions at protests and other events in relation to the anchor-out community, as
    well as other ensuing homeless issues in the CITY.

17          In fact, MR. PORTJE had many previous positive encounters with OFFICER WHITE
18  and cordial respectful encounters with OFFICER SMAGALSKI having been present along
19  with other members of the media at events and/or law enforcement calls where the two
20  officers were undertaking their duties. Both OFFICERS WHITE and SMAGALSKI were
21  thereby well apprised of MR. PORTJE's status as a journalist, particularly given that MR.
22  PORTJE was arguably the only African American journalist in Marin County and one who
23  consistently covered Marin and Sonoma Counties on issues of homelessness, poverty and
24  mental health. MR. PORTJE however kept his distance from SERGEANT GEORGES having
25  been apprised of SERGEANT GEORGES racially insensitive and intolerant sentiments and
26  proclivities as exhibited and directed towards people of color in and among the homeless
27  community.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Given his otherwise cordial relationship with OFFICERS' WHITE and SMAGALSKI, at some point after the events on that early evening quieted down, MR. PORTJE walked over to OFFICER SMAGALSKI and engaged him in an amicable conversation with respect to a prior incident involving the towing of another homeless person's vehicle in Sausalito. MR. PORTJE has preciously covered the towing as a news item pertaining to homelessness in the CITY. In discussing the equitableness of the OFFICER SMAGALSKI's decision, the conversation led to political ideology wherein MR. PORTJE politely asked OFFICER SMAGALSKI if he supported or was a member of the Oathkeepers, an organization comprised of former and furtively current military and law enforcement members who claim to defend the U.S. Constitution and who were integral in assisting in opposing the Black Lives Matter protests after the murder of George Floyd. OFFICER SMAGALSKI expressed annoyance at MR. PORTJE's accusation and exposure of law enforcements complicity with such white supremacist organizations.

Nevertheless, having been on the scene for approximately one hour moving in and around the location capturing footage of DEFENDANT OFFICERS and their interaction with the encampment members without a single instance of DEFENDANT OFFICERS questioning MR. PORTJE's intention or ordering him to stop filming and/or to move his location, MR. PORTJE withdrew some 100 yards away to capture a long shot and obtain a moment of calm and silence.

While looking through both his zoom lens and with unmediated sight, MR. PORTJE noted DEFENDANT OFFICERS huddled together in front of their squad car looking over and pointing in his direction.

Soon thereafter, DEFENDANT OFFICERS broke their huddle with OFFICER GEORGES setting off determinedly in a straight line in MR. PORTJE's direction. Observing that OFFICER GEORGES was approaching him with an officious and aggressive gate, as well as with a facial expression projecting anger and belligerence, MR. PORTJE was confused as why OFFICER GEORGES was approaching him with such a demeanor, as he had done nothing to upset DEFENDANT OFFICERS. MR. PORTJE was reasonably fearful,

1    as an armed Caucasian police officer with a gun was approaching him, an African American

2    man, with rage upon his face.

3         Upon reaching the location of MR. PORTJE's camera and tripod, OFFICER

4    GEORGES turned his back towards MR. PORTJE and his camera with a firmly

5    communicated intention of blocking the camera's lens and thus 'shuttering' the camera's

6    ability to capture footage. OFFICER GEORGE pushed his back against the camera lens

7    prompting MR. PORTJE to exclaim, "what's going on. What are you doing, Officer?

8    OFFICER GEORGES failed to answer, smirking and chewing his gum.

9         With extreme bafflement and fear for his safety and the safety of his camera, as well

10   as trying to avoid OFFICER GEORGES obvious and transparent provocation and incitement

11   to elicit a physical response from MR. PORTJE, MR. PORTJE lifted his camera and tripod

12   and moved it to the left in order to free himself and the camera from the backward pressure

     exerted by OFFICER GEORGES.

13        In response to MR. PORTJE's stepping away and to the side of OFFICER

14   GEORGES, OFFICER GEORGE also took a step to the left in order to resume blocking and

15   pushing against MR. PORTJE's camera. MR. PORTJE again asked OFFICER GEORGE

16   "why are you doing this?" Again, OFFICER GEORGES was silent while his intention of

17   provoking MR. PORTJE into an altercation was being clearly physically communicated. MR.

18   PORTJE again responded by lifting his camera and tripod and stepping to the right to again,

19   free himself and the camera lens from being blocked by OFFICER GEORGES.

20        After completing this absurd 'dance' of provocation, OFFICER GEORGES turned and

21   positioned himself to the front and side of MR. PORTJE, pressing his body against MR.

22   PORTJE who exclaimed, "why are you doing this…there's no reason to stand next to me and

23   watch me shooting."

24        In response, OFFICER GEORGES turned full frontal and directly lunged at MR.

25   PORTJE, who responded by grabbing hold of his tripod and back peddled a few steps. In

26   lunging at MR. PORTJE and grabbing onto the camera's tripod, OFFICER GEORGES struck

27   his face against the camera causing a laceration. Simultaneously, OFFICER GEORGE

28   reached up and grabbed MR. PORTJE's dreadlocks and began throwing punches, yelling,

"stop resisting.' Immediately, OFFICERS' WHITE and SMAGALSKI arrived with one of the two Officers or DOES 1-10 commanding and reassuring MR. PORTJE to let go of his camera as the officer had a hold of it. Thereafter, OFFICER GEORGES moved behind MR. PORTJE and applied a shoulder lock maneuver shouting, "stop resisting" to which MR. PORTJE replied, "I'm not resisting…you're not ordering me what to do?

In response to OFFICER GEORGES' applying upward pressure on the shoulder lock tearing into his rotator cuff, MR. PORTJE immediately dropped to his knees. With two of the DEFENDANT OFFICERS by his side and the other behind him applying the shoulder lock, MR. PORTJE was on his knees firmly subdued.

By this time, a crowd from the encampment stood by filming and berating DEFENDANT OFFICERS for attacking an innocent journalist. MR. PORTJE spoke to the crowd questioning the reasonableness of DEFENDANT OFFICER's provocation and attack. In speaking to the crowd, for some reason, OFFICER GEORGES, or whomever was behind him at that point, released the shoulder lock permitting MR. PORTJE to move his arms and hands in front him which allowed him to gesticulate with his words. Thereafter, OFFICER GEORGES or whomever was behind him, reclaimed MR. PORTJE's arms and placed them behind him, reapplying the shoulder lock. This release of MR. PORTJE's arms occurred a second time allowing for MR. PORTJE to gesticulate a second time when further addressing the crowd by calling out DEFENDANT OFFICERS' intentional provocation and blatant violation of his First Amendment rights as a journalist.

After allowing MR. PORTJE to sit on his knees in full display of the encampment as a clear and unequivocal warning to them, as well as striking an all too frequent pose of an African American defendant seized by a cadre of Caucasian police (clearly the modern embodiment of the gruesome history of slave catchers in the South), DEFENDANT OFFICERS firmly applied two sets of handcuffs on MR. PORTJE and after lifting him to his feet, paraded him to the squad car.

While walking, MR. PORTJE again asked in bewilderment, "what's going on. Am I going to jail, am I under arrest?" Concerned with his camera, he asked the OFFICERS what

will happen to which they replied, "it will be going with you. You'll be able to retrieve it after."

  With excruciating pain in his shoulder, MR. PORTJE was placed in DEFENDANT OFFICERS' squad car and after fifteen minutes, drove to the SPD's stationhouse. In complaining about the pain to his shoulder and his wrists on account of the tightness of the handcuffs, OFFICER WHITE loosened the cuffs and apprised him that they would be going to the hospital shortly.

  While at the SPD stationhouse, CHIEF ROHRBACHER was actively engaged in MR. PORTJE's processing having first stood guard over him while OFFICER GEORGES prepared to compile the arrest paperwork, and thereafter assisting OFFICER GEORGES with preparing that paperwork.

  CHIEF ROHRBACHER was well acquainted with MR. PORTJE having fielded questions from MR. PORTJE as part of media press conferences and interactions as a representative of the press on more than several occasions. As MR. PORTJE is the only African American journalist covering the City of Sausalito, CHIEF ROHRBACHER was all too familiar with MR. PORTJE and upon his arrest, which he had reason to know was without probable cause, took no remediative action but rather ratified and thereby, perpetuated and joined the conspiracy that his DEFENDANT OFFICERS had undertaken with the sole aim of silencing MR. PORTJE's journalist rights and privileges.

  After processing his arrest, OFFICER WHITE took MR. PORTJE to Marin General hospital's emergency room to determine the extent of the injuries that DEFENDANT OFFICERS inflicted upon him. At the hospital, MR. PORTJE necessitated assistance in removing his shirt on account of the severity of pain he experienced in his shoulder. Although x-rays revealed that there had existed no fracture, MR. PORTJE's rotator cuff was severally injured.

  After arriving at the Marin County Courthouse, MR. PORTJE was charged with crimes whose specificity was not revealed to him, while additionally required to post a bail amount of $15,000 despite having not appeared before a judge. At approximately 12:00 a.m., MR. PORTJE called his now panicking spouse, Plaintiff AMY PORTJE and informed her of

1

2

the events that transpired as well requesting assistance in contacting a bailbondsman in order to post bail.

At approximately 1:30 a.m., AMY PORTJE arrived at the Marin County Courthouse

3

4

to pick up her spouse, MR. PORTJE to place an end, at least for the moment, to the

5

horrendous nightmare that MR. PORTJE had been subjected to at the hands of

6

DEFENDANTS. Despite requesting the return of his camera and video equipment,

7

DEFENDANT DOES 1-10 refused stating that it was being held as 'evidence.' MR. PORTJE

8

was charged with two misdemeanor counts of battery and one felony count of obstructing an

9

executive officer.

Thereafter, on account of the abuses sustained at the hands of DEFENDANTS, MR.

10

PORTJE, in addition to experiencing severe and unceasing chronic pain in his shoulder, also

11

12

exhibited symptoms reflective of severe depression including excessive sleep(18 hours per

13

day), lack of appetite, unreasonable fear of police reprisals, apprehension and anxiety spurred

14

on by passing police sirens and police vehicles, and an overall depletion of interest and energy

in engaging in his journalistic pursuits.

15

MR. PORTJE additional incurred extensive financial hardship on account of the

16

injuries he sustained including the inability to earn income from his images as his camera and

17

video and still footage had been unreasonably withheld by DEFENDANTS. As such, MR.

18

PORTJE has been forced to seek rental assistance and other forms of assistance to survive.

19

MR. PORTJE has also faced reprisals and threats having received death threats on his life

20

from police supporters for being a 'cop hater,' as well as being lambasted in the press by

21

adversaries on the Novato Police Advisory Board who have sought his removal as vice chair

22

of the Board.

23

On or about December 7, 2020, after learning of MR. PORTJE's arrest and SPD's

24

intention of seeking a search warrant, David Snyder, Executive Director of the First

25

Amendment Coalition sent a letter to the CITY's Mayor Jill Hoffman, CHIEF

26

ROHRBACHER and Marin County District Attorney Lori Frugoli, informing them that

27

California law strictly prohibited law enforcement from using search warrants to review

28

journalists' unpublished materials. The six-page letter also asserted that the police violated the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

California Shield Law protecting journalists, the First Amendment and the Federal Privacy Protection Act, in seizing MR. PORTJE's camera and media storage during his arrest and refusing to return it upon his release. The letter informed them that California Penal Code § 1524(g) prohibits the issuance of a warrant for information protected under California's journalist Shield Law which is enshrined in the California Constitution, Art. I, Sec. 2(b). California's Shield Law protects journalists from being held in contempt of court if they refuse to reveal "unpublished information obtained or prepared in gathering, receiving or processing of information or communication to the public."

Despite such law prohibiting the issuance of a warrant for 'unpublished information' against a journalist, on or about December 9, 2021, SPD Detective DAVIN ROSE sought a search warrant seeking permission to allow police to review materials stored on MR. PORTJE's camera, two memory cards, and an iPhone confiscated from MR. PORTJE during his arrest. As grounds for their warrant, DETECTIVE ROSE and the SPD relied upon the unsubstantiated ruse of investigating whether MR. PORTJE was a part of a conspiracy to commit a crime. Upon information and belief, CHIEF ROHRBACHER ordered and expressly ratified such blatant disregard of rights afforded MR. PORTJE as a journalist under state, federal and constitutional law. On Dec. 9, 2021 Marin County Superior Court Judge Mark Talamantes approved the search warrant. On or about Dec. 13, 2021, DETECTIVE ROSE sent a letter to MR. PORTJE informing him of the issued warrant and that MR. PORTJE's camera and storage cards had indeed been searched.

On or about Dec. 17, 2021, District Attorney Lori Frugoli postponed MR. PORTJE's arraignment scheduled for Dec. 20, 2021 on account of a 'pending investigation.' In response, MR. PORTJE's defense counsel, Charles Dresow sent a letter to DA Frugoli informing her that MR. PORTJE was intending to file a Motion to Quash the SPD's warrant on account of well established journalist privileges protected under state, federal and constitutional law. DA Frugoli responded the following day that the evidence had not been reviewed and that no action regarding the evidence would be taken until further notice from her office. However, attached to DA Frugoli's Dec. 21, 2021 letter was memo from an investigator at the Northern California Computer Crimes Task Force indicating the contents of the cell phone had been

downloaded onto his computer, though no one had viewed the data from any of MR.

PORTJE's devices. This affirmation however was expressly contradicted by DETECTIVE

ROSE's letter of Dec. 13, 2021 wherein DETECTIVE ROSE informed MR. PORTJE that his

camera and storage cards had indeed been searched!

On or about December 27, 2021, MR. PORTJE's defense counsel filed a Motion to

Quash SPD's warrant raising inadequacies with respect to the contents of the warrant itself,

prohibition against disclosure supported by California's Shield Law, violation of precedent

underlying Press freedoms and rights under the First Amendment to the U.S Constitution, and

violations of both the Reporter's Privilege recognized under the California Constitution, Art.

I, Sec. 2(a) and the Federal Privacy Protection Act 42 USC 2000aa et seq.

Immediately thereafter and in response, the District Attorneys' office dropped its three

charges against MR. PORTJE. Incensed at D.A. Frugoli's dropping the charges against MR.

PORTJE, CHIEF ROHRBACHER issued a statement pronouncing, "I am disappointed to

learn that the Marin County District Attorney has decided not to file charges against a man

accused of striking a police officer with his camera…I am concerned that the DA's decision

will encourage the continuing aggressive behavior of Jeremy Portje toward police."

MR. PORTJE's Motion to Quash was heard by Superior Court judge Geoffrey

Howard

on Dec. 29, 2021 wherein Judge Howard ordered the two parties to draft a stipulation to

return MR. PORTJE's camera, media memory cards, and IPhone and that any copies made

therefrom by the SPD must be destroyed and erased. The stipulation was signed by Judge

Howard on January 18, 2022 allowing for MR. PORTJE to reclaim his damaged camera and

memory cards.

Thus, as inferred from the above narrative of events, DEFENDANTS illegal conduct

toward MR. PORTJE, both with respect to obstructing MR. PORTJE's engagement in

journalistic newsgathering on a matter of public concern, as well as subjecting him to an

intentionally calculated and unprovoked violent assault, arrest, detention, and property

confiscation of his constitutionally protected journalistic work product, resulted from SPD

1   policies and/or customs that patently disregarded the clearly established rights afforded

2   journalists like MR. PORTJE.

3         Such policies and customs blatantly reflect the CITY, CHIEF ROHRBACHER and

4   SPD's indifference and ratification of (1) misconduct by DEFENDANT OFFICERS and

5   DOES 1-10 with respect to their engagement with journalists in the field, as well as the

6   mishandling of journalistic workproduct thereafter; (2) misconduct by DEFENDANT

7   OFFICERS and other SPD officers with respect to their engagement with African American

8   journalists in the field and (3) failures of training and supervision to require police officers to

9   follow the law and established departmental policies.

10        Primarily, CHIEF ROHRBACHER, DETECTIVE ROSE, and DEFENDANT

11  OFFICERS and DOES 1-10's treatment of MR. PORTJE was in clear violation of SPD

12  Policy section 322.1 which provide guidelines, albeit rather broad and amorphous, for media

13  access to police activity. See SPD Policy Manual.

    https://www.sausalito.gov/home/showdocument?id=27354.

14        SPD Policy 322.3 requires that 'authorized' members of the media producing 'valid

15  press credentials worn in areas otherwise closed to the public' shall be provided access to

16  scenes of disasters, criminal investigations, emergencies and other law enforcement activities

17  and that reasonable effort[s] should be made to provide a safe staging area for the media that

18  is near the incident and that will not interfere with emergency or criminal investigation

19  operations. SPD Policy 322.3(2)(1).

20        Additionally, SPD Policy 322.1 et seq was not only patently disregarded with respect

21  to how DEFENDANT OFFICERS handled MR. PORTJE's coverage of the November 30,

22  2021 events at Marinship Park, but that, as drafted, the policy itself was facially deficient and

23  well out of compliance with Section two of California Penal Law 409.7 signed into law on or

24  about October 21, 2021 and thus applicable to DEFENDANT OFFICERS' encounter with

25  MR. PORTJE on November 30, 2021.

26        California Penal Law 409.7 prevents police from blocking journalists covering events

27  wherein "individuals are engaged in activity that is protected pursuant to the First Amendment

28  to the United States Constitution or Article I of the California Constitution" Section

509.7(a)(1) and ensures that reporters can be in these areas without being arrested. Section 509.7(a)(3). The law expressly prohibits police from "intentionally assaulting, interfering with, or obstructing" journalist's news gathering. Section 509.7(a)(2).

As such, not only had DEFENDANT OFFICERS patently disregarded their own internal SPD journalist policies, but even more egregious, they violated Penal Law 409.7 et seq., which was in full force and effect on November 30, 2021, the date of DEFENDANT OFFICER's encounter with MR. PORTJE.

Additionally, DEFENDANT OFFICERS' conduct directed at MR. PORTJE was by no means motivated by MR. PORTJE interfering with DEFENDANT OFFICERS' police activities on the scene, intrusion upon and within DEFENDANT OFFICERS' police perimeter, refusal to comply with DEFENDANT OFFICERS' orders or commands, inciting and/or provoking DEFENDANT OFFICERS' with obscenities or criticisms, or any other reasonable basis but rather plainly that MR. PORTJE was an African American journalist who had been actively covering the plight and protests of Sausalito's anchor-out community who were unceremoniously forced into homelessness in one of the wealthiest cities in Marin County. As a continuous presence at police encounters involving DEFENDANT OFFICERS, MR. PORTJE, an articulate and professional African American journalist was simply too much for DEFENDANT OFFICERS to bear.

Thus, in blatant violation of SPD policy, as well as of state, federal and constitutional law, DEFENDANT OFFICERS and CHIEF ROHRBACHER conspired to teach MR. PORTJE a lesson and put him in his place, as the 'uppity black man' that he was, by conspiring to blatantly violate his journalistic rights, as well as to incite and provoke a physical response in order instill a beating and prosecution designed to silence his spirit and journalistic advocacy for the disempowered in the City of Sausalito.

Thus, on or about November 30, 2021, DEFENDANT OFFICERS, without any reasonable, lawful, or evidentially supportable rationale for asserting any suspicion or probable cause that MR. PORTJE had violated any policy, regulation, or criminal law, made a conscious and intentional decision to obstruct his newsgathering activities and provoke and incite a physical altercation with DEFENDANT OFFICERS in order to provide a justifiable

excuse for DEFENDANT OFFICERS to effectuate a physical beating, i.e., "horse whipping" and thereafter charges sufficient for an arrest and prosecution. Upon information and belief, DEFENDANT OFFICERS conspired to undertake such action based predominantly upon MR. PORTJE's race.  69.      Despite SPD policy and CITY resolutions  prohibiting treating citizens differently on account of their race, as well as federal state and constitutional law vehemently prohibiting such conduct, DEFENDANT OFFICERS, CHIEF ROHRBACHER, DET. ROSE and DOES 1-10 relied upon MR. PORTJE's race as a motivating factor in (1) disregarding and violating MR. PORTJE's rights as a journalist; (2) inciting and provoking MR. PORTJE to physically push or strike DEFENDANT OFFICERS in order to substantiate an excuse for a  beating and subsequent charges for an arrest; (3) effectuating an arrest; (3) placing him in custody; (4) detaining him prior to arraignment; (5) retaining his camera, video footage, and smart phone; and (6) seeking a search warrant to review his constitutionally protected unpublished journalistic work product.

Here, MR. PORTJE was subjected to a similar response as had African American CNN journalist Omar Jiminez who, in 2020 was arrested in Minneapolis during protests against the murder of George Floyd where Jiminez was arrested while his white CNN colleague reporter, Josh Campbell standing in the same location was free to remain on the scene.  Here, in light of the plethora of clearly established protections afforded journalists that were well acknowledged and disseminated throughout the SPD, a strong inference exists that DEFENDANT OFFICERS' motivation for patently disregarding MR. PORTJE's journalistic privilege by inciting and provoking him to physically respond to OFFICER GEORGES provocation, and thereafter, effectuating his beating, arrest, detention, and retention of property was based primarily on MR. PORTJE's race.

DEFENDANT OFFICERS' conduct and CHIEF ROHRBACHER and DOES 1-10's assent and facilitation thereof was in patent violation of the First, Fourth and Fourteenth Amendments of the US Constitution, as well as Article 1, Section 7 of the California Constitution.

CHIEF ROHRBACHER, DETECTIVE ROSE and DOES 1-10 similarly turned an intentionally blind eye to their requirements under Federal and State law which expressly

required them to respect journalistic work product by prohibiting such from being subject to a search warrant. Specifically, CHIEF ROHRBACHER, DETECTIV ROSE and DOES 1-10 customarily ignored and disregarded California's Shield Law, Cal. Constitution Art. I, Sect. 2(b) , the Reporter's Privilege, Cal. Constitution Art. I, Sec. 2(a) , the Federal Privacy Protection Act 42 USC 2000aa et seq. , and press freedoms and rights under the First Amendment to the U.S Constitution.

Thus, at the time of MR. PORTJE's unlawful arrest, as well as the subsequent deprivations he incurred therefrom, DEFENDANT OFFICERS, CHIEF ROHRBACHER, DET. ROSE and SPD DOE Officials failed to apply and respect the forementioned rights, laws, and SPD policies.

On information and belief, and based upon strong inferences of how DEFENDANT OFFICERS, CHIEF ROHRBACHER, DET. ROSE and DOES 1-10 patently ignored SPD policies and State, Federal, and constitutional law, the CITY OF SAUSALITO, at all times relevant to this complaint, has had a policy, custom and practice of failing to supervise and discipline officers who (1) subject its citizens to provocation and incitement to engage in conduct  that would lead them to arrest and/or incur excessive force, (2) effectuate an arrest without probable cause, and (3) obstruct and prevent members of the press and public from recording public events and associated police activity conducted in public view. In addition, the CITY's failure to supervise and discipline officers who engage in the above conduct when such conduct is substantially motivated and directed at a citizen based on a protected category such as race.

Similarly, based upon the same strong inferences of how both DEFENDANT OFFICERS, CHIEF ROHRBACHER, DETECTIVE ROSE and DOES 1-10 patently disregarded SPD policies and state, federal, and constitutional law, the CITY failed to either provide or enforce training for its officers of (1) the unlawfulness of a police officer inciting and provoking a citizen to engage in conduct that subjects him or her to arrest and/or incurring excessive force, (2) how First Amendment rights pertain to the press and public's ability to record public events and associated police activity taking place in public locations, and (3) the rights held in implements and outputs, i.e., camera, digital storage media, of First

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

Amendment activity. In addition, the CITY failed to provide or enforce training as to the unlawfulness of engaging in the above conduct when such conduct is substantially motivated and directed at a citizen based on a protected category such as race.

Upon information and belief, current training of SPD officers continues to be insufficient to put an end to these ongoing constitutional violations, and it is reasonable to expect the aforementioned violations to reoccur.

At all times relevant to this Complaint, the CITY and SPD have also failed to train its police recruits and active-duty officers that, according to its own general orders in the SPD Patrol Guide and under Federal and California law, members of the media may not be excluded from areas open to the general public, and that officers may not detain, arrest or retaliate against individuals for filming or photographing police activity in public.

Upon information and belief, repeated failure to supervise and discipline illustrates the CITY and the SPD's deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of the press and public to be free from false arrest and the unimpeded ability to conduct journalistic activities including the recording of police conduct in public.

The CITY and SPD's policy of retaining press-member MR. PORTJE's camera and storage media post-release and seeking a search warrant to investigate its contents shows deliberate indifference to First Amendment rights and the exercising of First Amendment activity.

The constitutional violations MR. PORTJE suffered at the hands of SPD, DEFENDANT OFFICERS, CHIEF ROHRBACHER, DETECTIVE ROSE and DOES 1-10 were caused by (a) the CITY's unconstitutional practices and policies; (b) the CITY's failure to provide and/or enforce training to its officers of: (1) the unlawfulness of a police officer inciting and provoking a journalist and/or citizen to engage in conduct that subjects him or her to arrest and/or excessive force, as well as (2) the First Amendment rights of journalists to record public events and associated police activity from public locations, and (3) the rights held in cameras, phones and storage units as appendages of First Amendment activity; and (c) the CITY's failure to supervise and discipline officers to prevent them from (1) engaging in unlawful and unconstitutional conduct of inciting and provoking a journalist and/or citizen to

engage in conduct that subjects him or her to arrest and/or excessive force and (2) improperly and unlawfully obstructing and/or preventing journalists and individuals from recording public events and associated police activity in public locations. In addition, the CITY's failure to provide or enforce training as the unlawfulness of engaging in the above conduct when such conduct is substantially motivated and directed at a citizen based on a protected category such as race.

DEFENDANT OFFICERS, CHIEF ROHRBACHER, DETECTIVE ROSE and DOES 1-10 callously disregarded MR. PORTJE's rights – and their own sworn obligation to uphold the law – and knowingly deprived him of his First Amendment rights as a journalist, as well as his rights to due process and to be free from unreasonable search and seizure.

As a direct result of the illegal arrest, seizure, and refusal to return his camera and video equipment, MR. PORTJE has been forced to forego journalistic assignments and/or the ability to sell still photographs or video footage on account that he is without his camera and media. All of these disruptions directly affected MR. PORTJE's income as a freelance journalist and infringed upon his First, Fourth, and Fourteenth Amendment rights.

As a result of DEFENDANT OFFICERS November 30, 2021's beating, arrest and detention of MR. PORTJE, MR. PORTJE has suffered severe and chronic unceasing pain in his shoulder, symptoms of severe chronic depression including excessive sleep(18 hours per day), lack of appetite, fear of police reprisals, apprehension and anxiety spurred on by passing police sirens and police vehicles, and an overall depletion of interest and energy in engaging in his journalistic pursuits.

Similarly, MR. PORTJE's wife, AMY PORTJE has incurred harms on account of DEFENDANTS inexcusable and callous violations of her husband's well established rights, both as a journalist and an African American walking the streets in Marin County where AMY PORTJE's harms have manifested in physical, psychological, economic, spiritual, and social damages.

3. **Legal Issues**:

Plaintiff Jeremy Portje claims his First, Fourth, and Fourteenth Amendment rights were violated.  He further claims violations under California state laws and seeks monetary

damages for emotional distress as well as attorney's fees.  Plaintiff Amy Portje asserts a derivative claim for loss of consortium as a result of her husband's arrest.

Defendants dispute these claims and assert that Plaintiff Jeremy Portje was arrested with probable cause.  Defendants further contend there was no violation of any state or federal laws related to Plaintiff's arrest and that a search warrant was properly obtained related to Plaintiff's personal property (including video camera and cell phone).

4. **Motions**: There are no motions pending at this time.  Defendants anticipate filing a motion for summary judgment.

5. **Amendment of Pleadings**: The parties proposed September 30, 2022 as the deadline to amend any pleadings.

6. **Evidence Preservation**: The parties confirm they have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action.

7. **Disclosures**: Initial disclosures were made by the parties and documents will be exchanged

8. **Discovery**: The parties anticipate completing written discovery and depositions of the main witnesses in the case by end of December.  The parties are in the process of formulating a discovery plan.

9. **Class Actions**: This matter is not a class action.

10. **Related Cases**: There are no related cases at this time.

11. **Relief**: All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

12. **Settlement and ADR**: The parties have discussed ADR options and are willing to proceed with private mediation.

13. **Consent to Magistrate Judge For All Purposes**: The parties do not consent to a magistrate for trial.

14. **Other References**: No other references at this time.

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

15. **Narrowing of Issues**: No narrowing of issues reached at this time or request to bifurcate.

16. **Expedited Trial Procedure**: The parties do not believe this matter can be handled under Expedited Trial Procedure.

17. **Scheduling**: The parties propose the following dates:

- Designation Of Experts            7/24/23
- Discovery Cutoff                       6/30/23
- Hearing Of Dispositive Motions  8/31/23
- Pretrial Conference                        ~~10/9/23~~  TBD
- Jury Trial                                 1~~1/13/23~~  TBD

18. **Trial**: Jury trial estimated at 7-8 days.

19. **Disclosure of Non-party Interested Entities or Persons**: The parties will have filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-15 in advance of the case management conference.

20. **Professional Conduct**: All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

21. **Other Matters:** No additional matters to be discussed at this time.

///

///

///

///

///

///

///

///

///

///

///

///

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

1   Dated:  October 7, 2022                        KAUFMAN DOLOWICH & VOLUCK, LLP

2

3                                                  _____
                                                   AIMEE G. HAMOY
4                                                  Attorneys for Defendants
                                                   CITY OF SAUSALITO, SAUSALITO POLICE
5                                                  DEPARTMENT, CHIEF JOHN ROHRBACHER,
                                                   DETECTIVE DAVIN ROSE, POLICE OFFICERS'
6                                                  THOMAS GEORGES, SEAN SMAGALSKI, NICK
                                                   WHITE
7

8

9   Dated:  October 7, 2022                        LAW OFFICES OF BONNER & BONNER

10

11                                                 /s/ Charles A Bonner
                                                   CHARLES BONNER
12                                                 Attorneys for Plaintiffs
                                                   JEREMY PORTJE and AMY PORTJE
13

14
        The Court adopts the Joint Case Management Statement. Case management conference set for
15  October 21, 2022 is vacated. Case referred to Private Mediation.  Pretrial and Trial dates to be
    determined.  A Joint Case Management Statement due by February 17, 2023. Case
16  Management Conference set for February 24, 2023 at 8:30 a.m.

17
        Date: October 11,  2022
18

19

20

21

22

23

24

25

26

27

28

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**